CARPENTERS HEALTH AND WEL-
FARE FUND OF PHILADELPHIA
AND VICINITY By Robert GRAY,
Trustee Ad Litem & Carpenters Pension
Fund of Philadelphia and Vicinity By
Robert Gray, Trustee Ad Litem & Car-
penters Joint Apprentice Committee By
Robert Gray, Trustee Ad Litem & Indus-
try Advancement Program By Joseph
Washkill, Trustee Ad Litem & Metropol-
itan District Council of Philadelphia and
Vicinity United Brotherhood of Carpen-
ters and Joinders of America, Appellees
in No. 82–1733, Appellants in No. 82–
1734

v.

KENNETH R. AMBROSE, INC. & Ken-
neth R. Ambrose & Linda Ambrose, Ap-
pellants in No. 82–1733, Appellees in No.
82–1734.

Nos. 82–1733, 82–1734.

United States Court of Appeals,
Third Circuit.

Argued June 13, 1983.
Decided Dec. 30, 1983.

Stephen D. Ivey (argued), Anthony B. Quinn, Philadelphia, Pa., for appellees/cross-appellants, Kenneth R. Ambrose, Inc., et al.

William J. Einhorn (argued), Thomas W. Jennings, Sagot & Jennings, Philadelphia, Pa., for appellants/cross-appellees, Carpenters Philadelphia and Vicinity, et al.

Before HUNTER and HIGGINBOTHAM, Circuit Judges, and ZIEGLER, District Judge.*

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge. *

Kenneth and Linda Ambrose appeal from a judgment of the district court finding them personally liable along with Ambrose,

---

\* Honorable Donald E. Zeigler, United States District Judge for the Western District of Pennsylvania, sitting by designation.

Inc. for delinquent fringe benefit contributions in a suit brought by the Carpenters Health and Welfare Fund of Philadelphia and Vicinity (the "Fund")[1] under Section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185(a) (1976), and the Pennsylvania Wage Payment and Collection Law ("WPCL"), PA. STAT.ANN. tit. 43, §§ 260.1–.11. (Purdon Supp.1983–1984). The district court also awarded attorneys' fees to the Fund's attorneys. Counsel for the Fund cross-appeal from the district court's attorneys' fee award which reduced the lodestar by 50% and assessed liability for the attorneys' fees only against Ambrose, Inc., a bankrupt corporation.[2]

## I.

The Ambroses are the sole officers and majority shareholders of Ambrose, Inc., a construction firm. The corporation failed to make its required contributions to the various union pension funds as provided by their collective bargaining agreement. The delinquency in contributions resulted from financial difficulties caused in great part by Ambrose, Inc.'s failure to be paid for work it performed at the behest of the United Brotherhood of Carpenters and Joiners of America ("the Union").

The Fund filed a Section 301 LMRA[3] suit in federal court to recover the delinquent contributions. It also asserted a pendant state claim to collect liquidated damages equal to 25% of the amount owed as provided by the WPCL.[4]

During the district court proceedings, Ambrose, Inc. did not contest its liability to the Fund for the delinquent fringe benefits. Indeed, prior to trial it agreed to an entry of judgment against it for $17,199.25, as part of the sum owed to the Fund for attorneys' fees and for costs. Ambrose, Inc. only disputed the claim against it for liquidated damages. Linda and Kenneth Ambrose, however, contested both their individual liability for the delinquent contributions and liquidated damages, they also objected to the imposition of any counsel

---

1. Other plaintiffs include the Carpenters Pension Fund of Philadelphia and Vicinity, the Carpenters Joint Apprentice Committee, the Industry Advancement Program, and the Metropolitan District Council of Philadelphia and Vicinity United Brotherhood of Carpenters and Joiners of America (the latter plaintiff is designated on the docket sheet as Metropolitan District Council of Philadelphia and Vicinity United Brotherhood of Carpenters and "Joinders" of America).

2. These parties were previously before this court. *See Carpenters Health v. Ambrose, Inc.,* 665 F.2d 466 (3d Cir.1981). Relying on the rationale of *Croker v. Boeing Co. (Vetrol Division),* 662 F.2d 975 (3d Cir.1981) (in banc), which held that the amount of attorneys' fees must be determined before an order is final for purposes of appeal, the previous appeal was dismissed as jurisdictionally defective because the district court had not entered a final order as to the amount of attorneys' fees at the time of the appeal. Our appellate jurisdiction theory as announced in *Croker* was subsequently repudiated, at least by implication, by the Supreme Court. *White v. New Hampshire Department of Employment Security,* 455 U.S. 445, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982). Accordingly, we have since held that there can be appellate jurisdiction even when the amount of counsel fees has not been determined, *Hald-*

erman v. Pennhurst State School & Hospital, 673 F.2d 628, 644 (3d Cir.1982) (Sur Petition for Rehearing), and that "an appeal on the merits of the predicate case must be filed within the requisite time period following entry of judgment thereon, notwithstanding that an attorney's fee petition may also be, or has been, filed." *West v. Keve,* 721 F.2d 91, 95 (3d Cir. 1983).

3. Section 301 provides in relevant part:
   (a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
   29 U.S.C. § 185(a).

4. The Wage Payment and Collection Law provides for suits by unions against employers to recover delinquent pension and fringe benefit fund contributions. PA.STAT.ANN. tit. 43, §§ 260.1–.11 (Purdon Supp.1983–1984). It also provides for liquidated damages in the amount of 25% of the total amount due for sums which remain unpaid for more than 30 days. *Id.* at § 260.10.

fees against them in their individual capacity.

The district court ruled that the Ambroses were personally liable as employers under both the LMRA and the WPCL for delinquent contributions in the amount of $14,747.82. The district court also found both the Ambroses and Ambrose, Inc. liable under the WPCL for liquidated damages in the amount of 25% of the judgment or $8,173.14. It awarded attorneys' fees to plaintiffs' counsel, but after considering the fee application, the district court reduced the lodestar of $12,955.35 by 50% and imposed liability *only* against the corporation "because of overriding equitable considerations ...." Joint Appendix ("J.A.") at 53a.

■ The Ambroses appeal the District Court's finding that, in their individual capacities, they are liable as employers for the delinquent contributions.[5]

### II. The Ambroses' Individual Liability

#### A. The WPCL

The WPCL defines employer as:

every person, firm, partnership, association, corporation, receiver or other officer of a court of this Commonwealth and any agent or officer of any of the above-mentioned classes employing any person in this Commonwealth.

PA.STAT.ANN. tit. 43, § 260.2a (Purdon Supp.1983–1984). The district court concluded that as the "agents and officers" of Ambrose, Inc. the Ambroses fit within the meaning of the term employer as used in the WPCL, and were therefore liable to the

pension fund for unpaid contributions. J.A. 21a–24a.

■ The only state court decision to rule on the liability of corporate officers as employers under the WPCL is *Ward v. Whalen*, 18 Pa.D. & C.3d 710 (1981). In *Ward* the defendant who was the president and sole stockholder of Q-Dot, Inc., a bankrupt corporation, was held personally liable under the WPCL for the unpaid pension contribution. The defendant argued that under Section 260.3(b)[6] of the WPCL, which requires every employer who agrees to provide fringe benefits and make the requisite payment in 10 days, he could not be held liable as he was not a party to the collective bargaining agreement providing for the payment of pension benefits.

The court rejected the argument and found the defendant liable as an employer by definition. The court explained:

The legislature had some purpose for including an agent or officer of a corporation employing persons in the Commonwealth within the definition of employer, and the only apparent purpose was to subject these persons to liability in the event that a corporation or similar entity failed to make wage payments. Its reason for doing so is obvious. Decisions dealing with personnel matters and the expenditure of corporate funds are made by corporate officers and it is far more likely that the limited funds of an insolvent corporation will be used to pay wages and that a work force will be reduced while the corporation is still capable of meeting its obligations to its

---

**5.** The Ambroses also argue that the district court acted without jurisdiction on the WPCL claims and they further contend that the WPCL is pre-empted by the LMRA and the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. § 1144(a) (1976), *amended by* the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1145 (Supp. V–1981), we find that these contentions are without merit.

**6.** Section 260.3(b) provides:
(b) Fringe benefits and wage supplements. Every employer who by agreement deducts union dues from employes' pay or agrees to

pay or provide fringe benefits or wage supplements, must remit the deductions or pay or provide the fringe benefits or wage supplements, as required, within 10 days after such payments are required to be made to the union in case of dues or to a trust or pooled fund, or within 10 days after such payments are required to be made directly to the employe, or within 60 days of the date when proper claim was filed by the employe in situations where no required time for payment is specified.
PA.STAT.ANN. tit. 43, § 260.3(b) (Purdon Supp.1983–1984).

employes if personal liability is imposed on the persons who make these decisions. *Ward v. Whalen,* 18 Pa.D. & C.3d at 712. The court's ruling in *Ward* was followed in *In Re Johnston,* 24 B.R. 685, 687 (Bkrtcy.Pa. 1982).

Although "we are governed by state substantive law as pronounced by the state's highest court," *Safeco Insurance Co. of America v. Wetherill,* 622 F.2d 685, 687 (3d Cir.1980), *citing Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967); *Western Pennsylvania National Bank v. American Insurance Co.,* 428 F.2d 1220 (3d Cir.1970), the issue of the personal liability of a corporate officer pursuant to the WPCL has not been decided by the Pennsylvania Supreme Court or any Pennsylvania appellate court. In this case "our disposition ... must be governed by a prediction of how the state's highest court would decide were it confronted with the problem." *McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 661 (3d Cir.), *cert. denied,* 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). Thus, the trial court's decision in the *Ward* decision is entitled to "some weight," *Safeco,* 622 F.2d at 689, yet it is not controlling.

■ To us it is questionable whether the WPCL has so broad a scope that it imposes personal liability on those lower level corporate officers or employees who are merely implementing a policy at the command of their superiors; however, in this case we need not ascertain the breadth or outer limits of the ultimate coverage of the statute, because here there is no question that the legislature intended to include at least the highest ranking corporate officers, such as the Ambroses, who established and implemented the policy for the non-payment of the pension benefits. The Ambroses were the sole officers and the sole stockholders of the corporation. By an analysis of the related criminal penalty section statute, *PA.STAT.ANN.* tit. 43, § 260.11a (Purdon Supp.1983–1984), and when reading the statute as a whole, it is obvious that the legislature intended to impose personal civil liability on persons who hold corporate ex-

ecutive positions such as occupied by the Ambroses. Corporate officers violating any of the WPCL provisions are subject to criminal penalties under Section 260.11a(c) which provides:

> "[w]here such employer is a corporation, the president, secretary, treasurer or officers exercising corresponding functions [he or she] shall each be guilty of such summary offense."

PA.STAT.ANN. tit. 43, § 260.11a(c) (Purdon Supp.1983–1984). Certainly, if the legislature intended to impose criminal liability on such corporate officers, there is no reason to believe that they intended to relieve those same corporate officers from personal civil liability.

Although imposing liability for unpaid pension benefits on persons who have not contractually agreed to make the payments seems a harsh result, in the absence of other available decisions on the issue, we will affirm the district court's decision holding the Ambroses personally liable under the WPCL for the delinquent pension benefit contributions.

### B. The LMRA

The basis on which the district court imposed personal liability against the Ambroses under Section 301 LMRA is not clearly articulated; however, the court seemed to apply an alter ego theory to pierce the corporate veil, stating:

> The close relationship between the individuals and the corporation and the fact that there are only two officers and the majority shareholders of the corporation would most likely support the conclusion that they are the employer and therefore within federal jurisdiction.

J.A. at 22a. The court also applied the WPCL definition of employer, stating that "the definition of 'employer' under § 301 of the LMRA is at least as broad as the definition of that term in the Pennsylvania statute." J.A. at 48a. We disagree with the district court's findings.

■ A finding of an alter ego situation is a factual one and must be supported by the record. *Publicker Industries, Inc. v.*

284

*Roman Ceramics Corp.*, 603 F.2d 1065 (3d Cir.1979). In this case, the trial judge has committed the same mistake as that committed by the trial judge in *Publicker*. "The trial court made no findings that the circumstances normally required for application of the alter ego theory were present here." *Id.* at 1069. In *Publicker* we stressed that the piercing of the corporate veil or the alter ego theory is a "tool of equity [that] is appropriately utilized 'when the court must prevent fraud, illegality or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from public liability for a crime.'" *Id., quoting Zubik v. Zubik,* 384 F.2d 267, 272 (3d Cir.1967), *cert. denied,* 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968). "The burden of proof on this issue rests with the party attempting to negate the existence of a separate entity." *Id.* On the record before us there is insufficient evidence for us to conclude that the Ambroses were acting as alter egos of Ambrose, Inc.

■ In *United States v. Pisani,* 646 F.2d 83 (3d Cir.1981), we accepted the alter ego theory as federal law and set forth factors which are relevant in determining when the alter ego theory should be used to disregard the corporate entity. Those factors which we adopted from the Fourth Circuit's decision in *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681 (4th Cir.1976) are:

> [F]ailure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, nonfunctioning of other officers or directors, absence of corporate records and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Pisani,* 646 F.2d at 88, *quoting DeWitt Truck Brothers v. W. Ray Flemming Fruit Co.,* 540 F.2d at 686–87. Undercapitalization is an additional factor which the court may consider. *Id.*

■ The conduct of the Ambroses on the record established to date is quite different than that of Dr. Pisani, who operated the corporation with his own personal funds, loaned large sums to the corporation, and then repaid the loans personally with corporate funds *while the corporation was failing. Pisani,* 646 F.2d at 88. There is no evidence in the record to suggest that the Ambroses were taking money out of the corporation for their personal use; rather they acted more like good Samaritans for the survival of the corporation. They mortgaged their home in an attempt to keep the corporation solvent. Ironically, the corporation failed not for want of personal effort on the part of the Ambroses but because the very clients recommended by the Union failed to pay Ambrose, Inc. for the work it had done.

We have checked the record carefully and we have grave doubts whether as a matter of law the Ambroses could be held individually liable under LMRA. Furthermore, we do not accept the district court's conclusion that "employer" as used in the LMRA has as broad a meaning as the WPCL definition would suggest. As was stated by the district court in *Combs v. Indyk,* 554 F.Supp. 573, 575 (W.D.Pa.1982),

> [t]hat corporate officers are included within the statutory definition of employers under state law is too slender a reed for exposing such officers to liability under the federal common law of labor-management relations. To the contrary, it appears that insulation of corporate officers and agents from liability for section 301 violations was, in part, a basis for the parallel insulation of officers and members of local unions from liability for section 301 violations. *See Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 249, 82 S.Ct. 1318, 1325, 8 L.Ed.2d 462 (1962).

We find, therefore, that under Section 301 the Ambroses are not personally liable and we will reverse the district court's decision on this issue.

### III. Attorneys' Fee Award

■ The rules and standards governing attorneys' fees awards are well settled.

See *Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973) (Lindy I) and *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Sanitary Corp.*, 540 F.2d 102 (3d Cir.1976) (in banc) (*Lindy II*). The award of reasonable attorneys' fees is within the district court's discretion, and our review of the award is a narrow one. *Lindy II*, 540 F.2d at 115; *Silberman v. Bogle*, 683 F.2d 62, 65 (3d Cir.1982). The person seeking to establish an abuse of discretion bears a "heavy burden." *Lindy II*, 540 F.2d at 115–116. A district court is considered to have abused its discretion if "no reasonable [person] would adopt the district court's view ... [or] when the trial court uses improper standards or procedures in determining fees, or if it does not properly identify the criteria used for such determination." *Silberman*, 683 F.2d at 65.

▌ In *Lindy I* and *Lindy II*, we held that a district court, in considering a request for attorneys' fees pursuant to an agreement or statute, must first determine if the fee is reasonable. *Lindy I*, 487 F.2d at 167. A reasonable fee, the so-called "lodestar," is computed by multiplying the number of service hours expended by each attorney by a reasonable rate of compensation, usually an hourly billing rate. *Id.; Lindy II*, 540 F.2d at 108. The district court must then consider the contingent nature of success and the quality of the attorneys' work as two additional criteria before making a final determination of the attorneys' fee award. *Lindy I*, 487 F.2d at 168–69; *Lindy II*, 540 F.2d at 116–18. The contingency factor is utilized to "appraise the professional burden undertaken—that is, the probability or likelihood of success, viewed at the time of filing suit," *Lindy II*, 540 F.2d at 117, and it can increase the amount of the award. The quality factor of an attorney's work takes into consideration "the complexity and novelty of the issues presented," *Lindy I*, 487 F.2d at 168, and it can result in either an increase or decrease of the final fee award.

In this case our disagreement with the lower court is on two grounds: First, as to its reduction of the counsel fee by 50% for what the court terms "equitable considerations" and second, as to the court's preclusion of *any* award for counsel fees against the Ambroses personally even though they are also liable as employers under the WPCL. The entire opinion of the district court on the counsel fee issue is as follows:

Plaintiffs' application for counsel fees is unopposed. *I have no doubt that counsel actually spent the hours claimed, and the hourly rates are reasonable.* The amount claimed, $12,955.35, is *prima facie* correct. There are in my view, however, certain *equitable considerations* precluding an award of the full amount against all defendants.

The judgment which plaintiffs have obtained against the defendants includes a 25% penalty. More importantly, the defendants' failure to pay the required contributions into the union welfare fund was not, in any sense, a deliberate and intentional "refusal to honor their promises to pay" or "contemptuous disregard of an obligation," as plaintiffs now contend. Rather, they failed to pay for the best of all possible reasons: They did not have the money. More importantly still, the reason the defendants were unable to pay was because the firms with which they contracted (at the behest and with the encouragement of officials of the plaintiff unions) were financially irresponsible and failed to pay the defendants.

Unfortunately for the defendants, the brokerage activities of the union officials (in a good-faith effort to enable the defendants to provide employment for union members) did not give rise to a valid defense against the claims for pension and welfare contribution. *But because of overriding equitable considerations, I believe it appropriate to reduce the counsel fee award by 50%, and to impose it only against the corporate defendant.* An appropriate order follows.

J.A. at 52a–53a (emphasis added).

▌ We recognize that Ambrose, Inc. is insolvent and that as a practical matter the Ambroses, who do not seem to be affluent, will bear this significant economic burden alone in their individual capacity. Thus,

the district court's opinion would be persuasive if we were obligated to consider solely the economic consequences of an adverse judgment to the Ambroses. However, in contrast to the rationale of the district court, the trend of the cases does not favor the employer who fails to pay timely the benefits due employees. Indeed, "[b]ecause national labor policy evinces great solicitude for the interests of pension fund beneficiaries, courts have long treated plan trustees who seek to enforce contribution obligations with special favoritism." Note, *Denying the Illegality Defense: An Enigmatic Approach to the Delinquent Pension Fund Contribution Problem,* 34 Stan.L. Rev. 221, 222 (1981). Despite the hardship on the employer, trustees have a fiduciary obligation to collect the funds owed in order to pay pensions and other related benefits due employees. As one commentator has noted:

> Delinquent contributions threaten pension fund viability because the actuarial valuations require a predictable flow of income into the fund. Fluctuating income seriously affects these valuations and can eventually jeopardize the benefits a plan is committed to pay. The fund loses investment income as the asset base erodes, and it incurs increased administrative expenses from costly detection efforts, attorneys' fees, and other ancillary costs that arise in the collection effort.

*Id.* at 226.

█ Like the district court, we are sympathetic to the economic plight of the Ambroses just as we would be toward others whose corporation becomes insolvent leaving them with an obligation to pay from their personal funds those debts which would have been paid by their corporation if it had remained solvent. We recognize that the Ambroses' involvement in this economic maelstrom could have been an attempt on their part to accommodate various union leaders who had recommended the companies for which Ambrose, Inc. performed the work. When those companies, which the Union recommended, failed to pay the Ambroses in full, the Ambroses were denied a source of funds to meet their contractual obligations to the Trustees.

Despite these financial problems, the Ambroses are not the only victims in this series of unfortunate economic events. Other victims include the working men and women who expended their labor for the Ambroses and were entitled to the pension and related benefits under the union contract, which benefits will be paid solely because of the litigation the Trustees initiated in this case. Other, though perhaps less obvious, victims are the plaintiffs' health and welfare funds, which are entities legally separate from the Union, entitled to the money contractually due them to meet their statutory and fiduciary obligations to the members of the Union. *Cf. NLRB v. Amax Coal Co.,* 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981). When the Trustees must pay counsel fees to acquire the money owed them, there is a resulting diminution of funds available to pay welfare and pension benefits to the Union members. The likely consequence of the "equitable considerations" relied on by the trial judge in holding that the Ambroses are not obligated to pay any counsel fees is that monetary benefits due union members could be jeopardized because funds that otherwise would have been available have been spent on counsel fees.

While it may be questionable whether those events that the district court termed "equitable considerations" may ever be used to deny counsel fees *in toto,* certainly under the facts of this case the "equitable considerations" do not tilt so strongly in favor of the Ambroses that the court can exonerate them from paying *any* counsel fees. The Ambroses voluntarily entered the construction contracts intending to make a profit. They are not philanthropists but business persons who unfortunately made an unprofitable deal. In weighing these factors, we find no basis for holding that the Ambroses do not have to pay any amount of counsel fees since they are considered to be employers.

Because the district court reduced the counsel fees by 50% for "equitable considerations," we are not certain whether the court would have made the counsel fee award differently if it had considered the

factors as we have noted them in this opinion.

For the foregoing reasons, we will affirm the district court's judgment holding the Ambroses personally liable for the delinquent pension fund contributions under the WPCL, but we will reverse on the question of their liability under the LMRA. We will affirm the district court's judgment that plaintiffs are entitled to attorneys' fees; however, we will reverse the district court's judgment excusing the Ambroses from personal liability for the attorneys' fee award. We will vacate the amount of the award and remand this case to the district court for a redetermination of the attorneys' fee award and for further proceedings consistent with this opinion.